UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

              Petitioner,                 CIVIL ACTION NO. 00-90036

             v.                      DISTRICT JUDGE MARIANNE O. BATTANI

D-10   BRYON JONES,             MAGISTRATE JUDGE VIRGINIA M. MORGAN
       a.k.a. Brian Simms,

              Defendant.
_____/

## REPORT AND RECOMMENDATION

### I. Introduction

      This 28 U.S.C. § 2255 case comes before the court on defendant's Motion to Vacate

Sentence (D/E #666) alleging ineffective assistance of counsel by attorneys Thomas Wilhelm

and Richard Korn.  Wilhelm was defendant's attorney at trial and Korn was attorney at

sentencing  The government filed a response in opposition to that motion (D/E #679) and

defendant filed a reply to that response (D/E #686).[1]  For the reasons stated below, this court

recommends that defendant's motion to vacate sentence be **DENIED**.

_____

[1]While defendant's reply was untimely, he also filed a Motion for Extension of Time to
Reply to Response to Motion to Vacate (D/E #681).  This court grants that motion and
defendant's reply brief will be considered.

**II. Standard of Review**

Section 2255 of Title 28 of the United States Code permits a prisoner in custody under sentence of a federal court to move the court which imposed the sentence to vacate, correct, or set aside that sentence, on the grounds:

> the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack....

28 U.S.C. § 2255. Defendant has the burden of establishing any claim asserted in the petition. See Bowers v. Battles, 568 F.2d 1, 5 (6th Cir. 1977).

Where a constitutional error is alleged, in order to obtain relief under § 2255 the record must reflect a constitutional error of such magnitude it had a substantial and injurious effect or influence on the proceedings. See Brecht v. Abrahamson, 507 U.S. 619, 637-38, 113 S.Ct. 1710, 1721-22, 123 L.Ed.2d 353 (1993); Watson v. United States, 165 F.3d 486, 488 (6th Cir. 1999). In order to prevail on a § 2255 motion alleging non-constitutional error, a defendant must show a "fundamental defect in the proceedings which necessarily results in a complete miscarriage of justice or an egregious error violative of due process." Riggs v. United States, 209 F.3d 828, 831 (6th Cir. 2000); Gall v. United States, 21 F.3d 107, 109 (6th Cir. 1994). Thus, "[a] motion brought under § 2255 must allege one of three bases as a threshold standard: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." Weinberger v. United States, 268 F.3d 346, 351 (6th Cir. 2001).

## III. Background

For ease of reference, the relevant transcripts found in the record will be referred to as follows:

| | | |
|---|---|---|
| M Tr | = | Motion Hearing, November 10, 2004; D/E #581 |
| Tr IV | = | Jury Trial, Volume IV, May 26, 2005; D/E #622 |
| Tr V | = | Jury Trial, Volume V, May 31, 2005; D/E #621 |
| Tr VI | = | Jury Trial, Volume VI, June 1, 2005; D/E #620 |
| Tr VII | = | Jury Trial, Volume VII, June 2, 2005; D/E #619 |
| Tr VIII | = | Jury Trial, Volume VII, June 6, 2005; D/E #618 |
| Tr IX | = | Jury Trial, Volume IX, June 7, 2005; D/E #631 |
| Tr X | = | Jury Trial, Volume X, June 8, 2005; D/E #623 |
| S Tr | = | Sentencing, November 9, 2006; D/E #608 |

### A. Pretrial Proceedings

On November 16, 2000, a federal grand jury returned a five-count indictment against nineteen individuals, including defendant (D/E #3). The Indictment charged defendant Jones in Count 1, Conspiracy to Distribute Cocaine and Cocaine Base (Crack) in violation of 21 U.S.C. § 841, and Count V, Money Laundering Conspiracy in violation of 18 U.S.C. § 1956. While there were nineteen individuals originally charged, only defendant went to trial.

On August 20, 2003, defendant was arraigned and federal defender Steven Scharg was appointed as defendant's counsel (D/E #23). Scharg represented defendant until August 9, 2004, at which point Scharg asked to withdraw as defendant's attorney due to a breakdown in the attorney-client relationship (D/E #209).

On August 12, 2004, attorney Thomas Wilhelm was appointed to represent defendant (D/E #210). By September 29, 2004, defendant sought to replace Wilhelm because Wilhelm failed to adopt and file defendant's motions (D/E #271). Wilhelm had already filed some motions on defendant's behalf, including a Motion for Notice From the Government Regarding 404(b) Evidence (D/E #314)[2], as well as joining in some other motions filed by co-defendants. Defendant later reconciled with Wilhelm, and Wilhelm continued to represent defendant through defendant's trial.

**B. Trial**

The Voir Dire and Jury Selection for defendant's trial began on May 17, 2005, with the jury being impaneled on May 24, 2005. Defendant's trial began on May 26, 2005. During the government's opening statement, the prosecutor noted that the jury would hear testimony relating to a previous arrest and conviction of defendant. (Tr IV, p. 21) Defense counsel Wilhelm immediately objected and a sidebar was conducted. (Tr IV, p. 21) At the sidebar, Wilhelm asserted that the previous arrest had nothing to do with the conspiracy charged in this case, while the prosecutor argued that he had explained his theory of the case to defense counsel

---

[2]Defendant's Motion for Notice From the Government Regarding 404(b) Evidence (D/E #314) was subsequently denied on the basis that the government did not intend to introduce any such evidence (M Tr p. 9).

earlier and that the arrest and conviction are relevant.  (Tr IV, p. 22)  The prosecutor also noted that defense counsel had failed to raise this issue in a motion *in limine*.  (Tr IV, p. 22)  The trial court ultimately stated: "Okay.  I'm going to let it in.  That's his burden to prove.  It's his theory.  If he doesn't, you can use that in your argument, why are they raising it."  (Tr IV, p. 22)

### 1. Special Agent German's Testimony

The first witness to testify at the trial was Special Agent Mark German of the Drug Enforcement Administration (DEA).  (Tr V, p. 29)  In 1994, Special Agent German was tasked with developing and operating a unit focused on intercepting parcels containing drugs that were being sent through private delivery companies.  (Tr V, p. 30)  According to Special Agent German, his unit was focused on "next day air" deliveries because, typically, the person sending the illegal drugs wanted to limit the time the package was exposed to law enforcement.  (Tr V, pp. 39-40)

On October 29, 1994, Special Agent German's unit came in contact with a package that listed Active Wear as the sender, with an address at 8550 Nine Mile Road in Oak Park, Michigan, and B&B Wholesale as the recipient, with an address at 8911 Delco in Chatsworth, California.  (Tr V, p. 41)  That package was subjected to a canine search and there was an alert for drugs.  (Tr V, pp. 42-43)  Several candles were found in the package, but the DEA did not probe any deeper and the package was sent on its way.  (Tr V, pp. 43, 46)

On April 4, 1995, Special Agent German's unit came in contact to a package that listed B&B Wholesale as the sender, with an address at 21430 Sheridan in Canoga Park, California, and Sheila Brown as the recipient, with an address at 2311 Ford in Detroit, Michigan.  (Tr V, p.

46) That package was subjected to a canine search and there was an alert for drugs. (Tr V, p. 48) A search warrant was obtained and the package was found to contain a wax candle. (Tr V, pp. 49-50) Inside the candle, there was a white powder that was later determined to be a kilo of cocaine. (Tr V, pp. 51-52) The DEA then attempted to conduct a controlled delivery of the package, but it was unsuccessful. (Tr V, pp. 52-57)

Special Agent German's unit also executed a search warrant at the 2311 Ford address in Detroit. (Tr V, p. 58) As a result of that search warrant, the DEA determined that 2311 Ford was essentially the same location as 2309 Ford, and that there were pieces of broken candles at that location. (Tr V, pp. 61-62) The DEA also found Ziploc bags, latex gloves and a jar labeled lactose, which are common tools of the drug trade, according to Special Agent German. (Tr V, pp. 63-64) Furthermore, Special Agent found opened boxes at the address. (Tr V, p. 68) One of the boxes was addressed to Angela Banner, with an address of 2311 Ford in the city of Detroit, Michigan. (Tr V, p. 69) The sender on that package was listed as the Business and Postal Center, with an address of 8693 Wilshire Boulevard in the city of Beverly Hills, California. (Tr V, p. 69) From the UPS tracking information on that package, Special Agent German was able to determine that the package had been sent by the Business and Postal Center on December 19, 1994. (Tr V, p. 70)

As a result of the events described above, the DEA started checking for packages being sent by Active Wear and, on April 21, 1995, they came in contact with a package sent from Active Wear, from the 8550 Nine Mile Road address in Michigan, to Active Wear, at the 8693 Wilshire Boulevard address in California. (Tr V, pp. 70-72) According to Special Agent

German, the package was going to the attention of Troy Williams.  (Tr V, p. 72)  Troy Williams

was later identified to be an alias for Riley Graham.  (Tr VI, p. 36)   The package contained a

candle and, inside the candle, was $15,040.00.  (Tr V, pp. 72-75)

The money was seized and Special Agent German directed the delivery company to

forward any inquires regarding it to him.  (Tr V, p. 78)  On April 24, 1995, he was contacted by

David Barnett.  (Tr V, p. 79)  Barnett indicted that he owned a business called Bonnets, which

was called Active Wear at one point and which was located at 8550 W. Nine Mile Road, and that

he sent the money to purchase inventory.  (Tr V, p. 81) Barnett also indicated that the businesses

he dealt with preferred to use cash and that Troy Williams had sent it to be delivered.  (Tr V, pp.

81-82)

Special Agent German then obtained a search warrant to search 8550 W. Nine Mile Road

and, according to him, it did not appear that a business was being conducted at that location

given the lack of customers, the lack of currency in the cash register, limited selection of clothes

for sale, lack of paperwork indicating sales or purchases.  (Tr V, pp. 83-88, 109-110)  Special

Agent German did find some opened cardboard boxes there and the labels on those boxes

indicated that packages were being sent from Active Wear, at the 8693 Wilshire Boulevard

address in California, to Sam's Clothing Store at 8250 W. Nine Mile Road in Oak Park,

Michigan, David Barnett at 1800 Brainard Apt. 101 in Detroit, Michigan, and David Barnett

25744 at W. Twelve Mile Road in Southfield, Michigan.  (Tr V, pp. 88-93)  Special Agent

German also found invoices indicating that packages had been sent to Troy Williams and Kelly

Terrell at the 8693 Wilshire Boulevard address in Beverly Hills, California.  (Tr V, pp. 97-100)

Special Agent German later contacted the Airborne Express delivery company and received information relating to the account belonging to Bonnets or Active Wear at 8550 W. Nine Mile Road.  (Tr V, p. 101)  According to that information, most of the packages sent from that account went to the 8693 Wilshire Boulevard address in Beverly Hills, though there was at least one other parcel sent to 8911 Delco in Chatsworth, California.  (Tr V, pp. 101-102)  Special Agent German also executed a search warrant at Barnett's home at 1800 Brainard.  (Tr V, p. 105)  During that search, he found more invoices consistent with packages being sent from Michigan to California, as well as a handwritten note from Riley Graham discussing next day air deliveries.  (Tr V, pp. 106-108)

In May of 1995, Special Agent German traveled to California in order to investigate the Business and Postal Center located on Wilshire Boulevard in Beverly Hills, California.  (Tr V, p. 115)  During his investigation, he learned that the address contained a three story office building and that the Business and Postal Center was located on the first floor.  (Tr V, p. 116)  The business was closed, so Special Agent German spoke with the owner of the building, Allen Phillips.  (Tr V, pp. 116-119)  Phillips told Special Agent German that Phillips had owned the Business and Postal Center for years before he decided to sell it.  (Tr V, p. 121)  Phillips also told Special Agent German that he eventually sold the business to defendant, who he knew as Brian Simms, in November of 2004.  (Tr V, p. 121)  According to Phillips, defendant paid $20,000 for the business, he paid in cash, and he gave his address as 9811 Delco, Chatsworth, California.  (Tr V, pp. 121-122)

Phillips also told Special Agent German that, shortly after defendant purchased the building, Phillips was approached by a man who identified himself as Troy Williams and that Troy Williams told Phillips that (1) Troy Williams was in fact the owner of the Business and Postal Center, and (2) he had provided the money for the purchase of the business.  (Tr V, p. 124)  According to Phillips, from that point on, he only dealt with Troy Williams.  (Tr V, p. 124)  Phillips told Special Agent German that, after a while, the Business and Postal Center was essentially abandoned and that Phillips began to receive complaints.  (Tr V, p. 125)  Phillips also told Special Agent German that Phillips then contacted Williams, and that Williams indicated that he was no longer interested in operating the business.  (Tr V, p. 125)

According to Special Agent German, Phillips allowed him to go into and search the Business and Postal Center.  (Tr V, p. 125)  In that business, Special Agent German found a contract between the Business and Postal Center and Active Wear that allowed Active Wear to rent a small mailbox inside the Business and Postal Center.  (Tr V, pp. 127-130)  Special Agent German also found some UPS parcel receipts, which indicated that packages had been sent to B&B Wholesale.  (Tr VI, pp. 23-24)  Special Agent German further found a pick-up record book that included references to Riley Graham's cousin, David Barnett, and Sam's Clothing Store. (Tr VI, pp. 25-27)

With respect to employees of the Business and Postal Center, Special Agent German learned that Kelly Terrell was an employee at the business and that she listed her home address as 9811 Delco, Chatsworth, California.  (Tr VI, pp. 12-16)  Special Agent German also

discovered that Julia Carter, using the name Albertha Kelly, had ordered products, such as shrink wrap, order forms, and stickers for the Business and Postal Center. (Tr VI, pp. 18-22, 29-30)

Special Agent German also went to the property at 9811 Delco. (Tr VI, pp. 42-43) According to the owner of the property, 9811 Delco had been rented to a Leon Smith from July of 1994 to April of 2005, at which point Smith indicated that his business had went under and he was no longer interested in renting the property. (Tr VI, pp. 42-45) Special Agent German went inside the property and found wax droppings on top of the washer and dryer, a receipt book for a store on 8550 W. Nine Mile Road in Oak Park, Michigan, and a business card listing Smith's work address as 8693 Wilshire Boulevard, Beverly Hills, California. (Tr VI, pp. 46, 50-54, 62) There was no indication that defendant lived there. (Tr VII, p. 28)

On December 5, 1995, Special Agent German was contacted by the Los Angeles Police Department with respect to a UPS package containing cocaine hidden in candles. (Tr VI, p. 67) Videotape relating to the mailing of that package revealed that Julia Carter had been the one to send it. (Tr VI, pp. 68-71) The package was being sent to 13201 W. Ten Mile Road in Oak Park, Michigan. (Tr VI, p. 70) Special Agent German then had an undercover DEA agent deliver the package, but, based on the reactions of the owner of the business at 13201 W. Ten Mile Road, he came to believe that the business owner was not the intended recipient of the package. (Tr VI, pp. 76-85) Special Agent German also learned that a UPS driver named Kyle Stevens had been by earlier looking for the package. (Tr VI, p. 83, 85-86) Kyle Stevens is Riley Graham's cousin. (Tr VI, p. 87)

Special Agent German obtained the limited records UPS had relating to the properties involved in this case.  (Tr VI, p. 102)  According to Special Agent German, those records revealed packages being sent from the Business and Postal Center to a number of addresses on Stevens' delivery route, including 8550 W. Nine Mile Road and 2311 Ford.  (Tr VI, pp. 102-109)  The records also revealed that, with respect to packages sent from Michigan from the relevant addresses, all went to 9811 Delco until December 2, 1994, at which point they went to the Wilshire Boulevard address.  (Tr VI, pp. 109-113)

Based on his interviews with Stevens, Special Agent German investigated the address of 24387 Rensselaer in the city of Oak Park, Michigan.  (Tr VII, p. 16, 18)  During that investigation, Special Agent German determined that the address was on Stevens' delivery route, it was an apartment rented by defendant and Samuel Richardson, the utilities were in defendant's name, and that defendant had a couple of cars registered at that address.  (Tr VII, pp. 16-22, 32)  Special Agent German did not speak with Richardson.  (Tr VII, p. 32)

### 2. Julia Carter's Testimony

The second witness to testify at defendant's trial was Julia Carter.  (Tr VII, p. 58)  Carter became associated with Riley Graham, who she knew as Bruiser or B, in Atlanta during the late 1980s or early 1990s, and, eventually, she began to ship candles containing cocaine for him.  (Tr VII, pp. 59-60, 71)  In January of 1995, Carter and Graham went to California and, on their second day there, they went to the Business and Postal Center.  (Tr VII, pp. 73-75)  Graham told Carter that he owned that business and Kelly Terrell worked there.  (Tr VII, p. 75)  Terrell was there on a daily basis.  (Tr VIII, p. 18)  Graham also told Carter that the business was a

partnership with defendant and defendant's brother.  (Tr VII, p. 78)  Carter saw defendant there two or three times.  (Tr VIII, p. 20)  Graham was there all the time.  (Tr VIII, p. 20)

According to Carter, the Business and Postal Center did not look like a functioning business.  (Tr VII, p. 80)  Carter did witness Graham pack a candle, wrapped in t-shirts, at the business before having Terrell send it out.  (Tr VII, p. 80) Carter also witnessed defendant come in with a box already wrapped up.  (Tr VII, p. 80)  At one point, Carter started working there and she ordered supplies for the business.  (Tr VII, pp. 82-83, 85-86)

Carter also testified that, during her time in California, she went to defendant's house on Victory, in Woodland Hills, and observed Graham and defendant speaking.  (Tr VII, p. 94)  The address was 19651 Victory.  (Tr VII, p. 45)  After that visit, Graham promoted her to being part of his criminal enterprise.  (Tr VII, p. 47)  According to Carter, she would collect money at a Western Union station, take it to the supplier, and receive cocaine.  (Tr VII, p. 97)  Then, she would go press the cocaine and wrap it in packaging in order to get it ready to be put in a candle. (Tr VII, p. 97, 103)  The next day, she would put the cocaine in a candle and get it ready for shipment.  (Tr VII, p. 98, 103)

According to Carter, she would meet with the suppliers at defendant's house.  (Tr VII, p. 99)  Defendant would know she was coming.  (Tr VIII, p. 32)  She would give defendant the money and then he would give her the cocaine.  (Tr VII, p. 99, 102) Defendant also had a machine for pressing the cocaine at his house and she would use it.  (Tr VII, p. 99)  Carter testified that she did this three of four times at defendant's house.  (Tr VII, p. 101)  She does not remember the exact days.  (Tr VIII, p. 12)

Carter testified pursuant to a Rule 11 Plea Agreement. (Tr VII, p. 106) Pursuant to that agreement, the government would recommend that she receive a sentence of probation to sixteen months due to her cooperation. (Tr VII, p. 107) Carter was facing five to forty years if she did not cooperate. (Tr VII, p. 107) She has previously been convicted twice for using fraudulent credit cards. (Tr VII, p. 111)

### 3. Kyle Stevens' Testimony

The third witness to testify at defendant's trial was Kyle Stevens. (Tr VIII, p. 41) Stevens is employed by UPS as a driver and part of his duties include delivering packages. (Tr VIII, pp. 41-43) Riley Graham is his cousin. (Tr VIII, p. 43) In 1993, Graham approached Stevens about getting a business on Stevens' delivery route. (Tr VIII, pp. 43-44) Stevens knew that drugs were going to be involved and he later learned it was cocaine specifically. (Tr VIII, p. 45) Stevens pointed out the area where he made his deliveries. (Tr VIII, p. 46) He was to get paid $500 to $1,000 per delivery. (Tr VIII, pp. 46-47)

Graham subsequently purchased a business at 8250 W. Nine Mile and Stevens delivered packages there. (Tr VIII, pp. 47-48) Eventually, Graham told Stevens that Graham had lost the lease on that property and the deliveries were switched to 8550 W. Nine Mile Road, which contained a clothing store. (Tr VIII, pp. 48-49) Stevens would also deliver drugs to 24387 Rensselaer. (Tr VIII, p. 50) Eventually, after the police spoke with Barnett, Stevens stopped delivering to 8550 W. Nine Mile Road. (Tr VIII, p. 53)

Graham would always call ahead and let Stevens know that a package was coming. (Tr VIII, p. 51) Moreover, some times Graham would ask Stevens to deliver a package to a different

address then the one it was addressed to.  (Tr VIII, p. 51)  Stevens was not paid for every delivery.  (Tr IX, p. 7)

Stevens was acquainted with defendant and defendant's brother.  (Tr VIII, p. 52) When he delivered packages to the Rensselaer address, it was defendant, defendant's brother, Graham or another man who would take the delivery.  (Tr VIII, p. 56; Tr IX, p. 20)  According to Stevens, he only delivered a package to defendant once.  (Tr IX, p. 21)  He does not remember the month or year of that delivery.  (Tr IX, p. 25)

Stevens also testified that, at one point, a package Graham had called about was not there to be delivered.  (Tr VIII, pp. 59-60)  Stevens searched for it and he even went to the address the package was addressed to, but they had not seen it.  (Tr VIII, pp. 60-61)  Later that day, Stevens observed the police at that address. (Tr VIII, p. 62)

Stevens testified pursuant to a plea agreement.  (Tr IX, p. 14)  Under the terms of that agreement, the government would recommend a range of fifteen months to probation in exchange for Stevens' cooperation.  (Tr IX, pp. 15-16)  Stevens faces a possible sentence of five to forty years imprisonment.  (Tr IX, p. 15)

**4. Jose Soto's Testimony**

Jose Soto was the fourth witness to testify at defendant's trial.  (Tr IX, p. 29)  In March of 1995, Soto was employed as a special agent with the Imperial County Narcotic Task Force.  (Tr IX, p. 30)  On March 20, 1995, Soto was part of an undercover reverse sting operation targeting a man named Pedro Sanchez.  (Tr IX, pp. 30-31)  Defendant accompanied Sanchez to that sting operation, took part in the drug deal, and was arrested for Conspiracy to Purchase

Cocaine once it was completed. (Tr IX, pp. 31-37) According to Soto, based on his conversations with defendant during the deal, defendant was agreeable to future cocaine deals. (Tr IX, p. 37)

### 5. Defendant's Testimony

Defendant testified at his trial. (Tr IX, p. 54) Defendant moved out to California in the middle of 1994 and, on his first day there, he ran into Riley Graham, who he knew because his brother and Graham's sister have a daughter together. (Tr IX, pp. 64-66) Defendant's brother is now deceased. (Tr IX, pp. 60-61)

Defendant went out to California in order to invest in businesses and he eventually settled on the Business and Postal Center because it was within his price range, it dealt with a field he was familiar with given his past work history, and the busiest season for the business was coming up. (Tr IX, pp. 70-72) He purchased the Business and Postal Center from Alan Phillips in November of 2004. (Tr IX, p. 72)

Subsequently, defendant was with Graham when they passed the Business and Postal Center. (Tr IX, p. 74) Defendant pointed out and identified his business. (Tr IX, p. 74) Graham asked to see the business and defendant showed it to him. (Tr IX, p. 75) Graham also offered to buy it, but defendant was only willing to rent him a mailbox at first. (Tr IX, p. 75) After defendant explained that he was going to hold onto the business for six months to a year, Graham offered to buy it after the six months had passed. (Tr IX, p. 76) Graham also told defendant that Graham would pay for Terrell to work there for the six months defendant owned the business. (Tr IX, p. 76) Defendant agreed. (Tr IX, p. 76)

Defendant was not at the Business and Postal Center much after that and he never handled any packages himself. (Tr IX, pp. 79, 82) He does recall introducing Graham to Phillips and learning that Carter was working there. (Tr IX, pp. 79-80)

Graham never paid defendant for the business. (Tr IX, p. 83) Defendant asked for the money a number of times and, when he asked about it in May of 1995, he also said something about closing the place down. (Tr IX, p. 84) Graham told him not to do that and informed defendant that the police had been by. (Tr IX, pp. 84-85) Defendant was worried because the business was in his name and he had been arrested before, but Graham told him that Graham had gotten the business out of defendant's name through a power of attorney. (Tr IX, p. 85) That did not sound right to defendant, but he "let it go." (Tr IX, p. 85) He never sold the business and it just went under. (Tr IX, p. 116)

Defendant admits that he was previously arrested and pled guilty to Conspiracy to Purchase Cocaine. (Tr IX, pp. 85-94) According to defendant, Graham did not know anything about that deal or the arrest. (Tr IX, p. 93)

Defendant testified that he used an alias because his brother had gotten a driver's license and credit cards in his name, and then ruined defendant's driving record and credit. (Tr IX, pp. 94-98) According to defendant, his brother and Samuel Richardson lived at the Rensselaer address. (Tr IX, p. 129)

Defendant also testified that he knows Stevens "to be a very honest person" (Tr IX, p. 130), but that Stevens is mistaken here (Tr IX, p. 126).

### 6. Iola Glasgow's Testimony

The fifth and final witness to testify at defendant's trial was Iola Glasgow, defendant's mother. (Tr X, p. 11) Glasgow testified that defendant's brother got a driver's license and credit cards in defendant's name before ruining defendant's driving record and credit. (Tr X, pp. 11-12)

### 7. Verdict

On June 9, 2005, the jury returned guilty verdicts as to both counts charged against defendant (D/E #443).

### C. Post-trial Proceedings

Following defendant's convictions, attorney Wilhelm asked to withdraw as defendant's counsel on the basis that defendant was asking him to make arguments that he believed he could not professionally make (D/E #502). The motion to withdraw was granted (D/E #505).

Attorney Sharon Payne was then appointed to represent defendant, but Payne subsequently had a disagreement with defendant as to how to proceed and she too asked to withdraw (D/E #533). Her motion to withdraw was granted (D/E #535)

Attorney Richard Korn was then appointed to represent defendant (D/E #541). As part of that representation, Korn filed a document labeled as "Defendant's Sentencing Memorandum and Addendum to Objections to Presentence Report" (D/E #589). In that filing, defendant, through Korn, objected to the presentence report on the basis that (1) the 1996 California conviction for Conspiracy to Purchase Cocaine relied upon by the probation department did not constitute a "prior sentence" within the meaning of the United States Sentencing Guidelines; (2)

the probation department wrongfully concluded that the enhancement provision of 21 U.S.C. § 841(b), based on the 1996 California conviction, applied in this case where there was no evidence presented that defendant committed any part of the charged offense after his 1996 California conviction became final; and (3) the probation department erred in the amount of drugs it attributed to him.

At sentencing, after a discussion of the various issues raised in defendant's objections, the trial court asked attorney Korn: "Are you seeking then an evidentiary hearing in terms of whether [defendant] was involved by a preponderance of the evidence after his release from jail in the California case?" (S Tr p. 17) Korn agreed that he was. (S Tr pp. 17-18) The trial court then heard testimony from Dennis Williams relating to defendant's participation in the conspiracy. (S Tr pp. 23-65) The trial court also heard additional testimony from Special Agent German relating to the conspiracy and the amount of drugs at issue. (S Tr pp. 74-98)

Following the evidentiary hearing, and further arguments, the government agreed that the prior conviction would not be used in calculating defendant's criminal history under the guidelines. (S Tr p. 106) The trial court then discussed the evidence presented at the hearing and found that defendant was involved in the conspiracy after his California sentence became final. (S Tr pp. 106-108) The trial court also found that defendant was responsible for 150 kilograms of cocaine. (S Tr pp. 108-110) In making those determination, the trial court used a preponderance of the evidence standard.

The district court ultimately sentenced the defendant to twenty years on each count, with the sentences to run concurrently. (S Tr pp. 128-131; D/E #607)

On November 15, 2006, the defendant filed a timely notice of appeal. (D/E #603).  As part of his appeal, defendant argued that his conviction should be vacated and the case remanded for re-trial on the ground that the district court committed plain error by admitting testimonial hearsay evidence in violation of the Confrontation Clause, and on the ground that the variance between the allegations in the indictment and the proof presented at trial amounted to a constructive amendment of the indictment.  The Sixth Circuit rejected petitioner's claim and affirmed his conviction on May 16, 2008.  United States v. Graham, 278 Fed. Appx. 538 (6th Cir. 2008).

On October 7, 2009, defendant filed the motion to vacate pending before the court (D/E #666).  In that motion, defendant argues that his conviction and sentence should be vacated because he was denied the effective assistance of counsel.  According to defendant, attorney Wilhelm was ineffective because he failed to file a pretrial motion regarding defendant's prior conviction, failed to object to inadmissible hearsay testimony, and failed to interview government witnesses or call defense witnesses.  Defendant also argues that attorney Korn was ineffective because he allowed the issue of whether defendant had a prior conviction to be decided by a preponderance of evidence standard, rather than the beyond a reasonable doubt standard.

On January 20, 2010, the government filed a response to defendant's motion to vacate (D/E #681).  In that response, the government argues that attorney Wilhelm did object to the admission of evidence regarding defendant's prior criminal conduct and that, in any event, the evidence was properly admitted.  The government also argues that the uncontested testimony

that defendant now identifies as hearsay did not result in a fundamental defect in the criminal proceedings. The government further argues that unsupported allegations of ineffective assistance of counsel based on trial counsel's decision not to call unidentified witnesses are far to speculative to justify awarding extraordinary post-conviction relief. With respect to attorney Korn, the government argues that defendant received the effective assistance of counsel as defendant stipulated to his prior felony conviction and attorney Korn obtained the sentencing relief sought, *i.e.* the exclusion of defendant's prior felony conviction from the calculation of defendant's criminal history under the guidelines.

On March 22, 2010, defendant filed a reply to the government's response (D/E #686). In that reply, defendant argues that evidence regarding his prior criminal conduct was not admissible under a *res gestae* theory and that attorney Wilhelm improperly delayed in objecting to it. Defendant also argues that the hearsay evidence went to the heart of the government's case and that he was prejudiced by its admission. Defendant further reiterated his arguments that attorney Wilhelm was woefully unprepared at trial and that the deficits in his performance were not strategic choices. Defendant also reiterated that the issue of whether he had a prior conviction to be used in sentencing should have been decided by a preponderance of evidence standard.

## IV. Discussion

In this case, all of defendant's claims rest on allegations of ineffective assistance of counsel. The Sixth Amendment provides, in pertinent part, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const.

amend. VI.  A defendant has a Sixth Amendment right not just to counsel, but to "reasonably

effective assistance" of counsel.  Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052,

2064, 80 L.Ed.2d 674 (1984).  In Strickland, the Supreme Court set forth a two-pronged test for

evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was
> deficient.  This requires showing that counsel made errors so
> serious that counsel was not functioning as the "counsel"
> guaranteed the defendant by the Sixth Amendment.  Second, the
> defendant must show that the deficient performance prejudiced the
> defense.  This requires showing that counsel's errors were so
> serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable.  Unless a defendant makes both showings, it
> cannot be said that the conviction ... resulted from a breakdown in
> the adversary process that renders the result unreliable.

466 U.S. at 687, 104 S.Ct. at 2064.  As with any other claim under § 2255, the burden of proving

ineffective assistance of counsel is on the defendant.  Virgin Islands v. Nicholas, 759 F.2d 1073,

1081 (3d Cir. 1985).

In considering the first prong of the test set forth in Strickland, the appropriate measure

of attorney performance is "reasonableness under prevailing professional norms."  Strickland,

466 U.S. at 688.  A defendant asserting a claim of ineffective assistance of counsel must

"identify the acts or omissions of counsel that are alleged not to have been the result of

reasonable professional judgment."  Id. at 690.  The evaluation of the objective reasonableness

of counsel's performance must be made "from counsel's perspective at the time of the alleged

error and in light of all the circumstances, and the standard of review is highly deferential."

Kimmelman v. Morrison, 477 U.S. 365, 381, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986).

The second prong of the <u>Strickland</u> test requires the defendant show counsel's deficient performance prejudiced the defense.  Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  <u>Strickland</u>, 466 U.S. at 691.  The defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Id</u>. at 694.  In <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), the Supreme Court further clarified the meaning of "prejudice" under the <u>Strickland</u> standard, explaining:

> Under our decisions, a criminal defendant alleging prejudice must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." ...  Thus, an analysis focusing solely on the mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective.

<u>Lockhart</u>, 506 U.S. at 369 (citations omitted).

The <u>Strickland</u> Court emphasized both prongs must be established in order to meet the claimant's burden, and if either prong is not satisfied the claim must be rejected, stating:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one....  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.  Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

<u>Id</u>. at 697.

Here, as discussed above, defendant asserted four grounds in support of his motion to vacate.[3] Each of those arguments will be addressed in turn and, as discussed below, defendant has failed to meet his burden with respect to all of them.

## A. Ground One

Defendant first argues that attorney Wilhelm was ineffective because he failed to file a pretrial motion regarding defendant's prior conviction. According to defendant, evidence regarding his prior conviction could not be admitted pursuant to Fed. R. Evid. 404(b). The government, on the other hand, argues that the evidence was properly admitted as background evidence under a *res gestae* theory.

Rule 404(b) of the Federal Rules of Evidence generally prohibits the introduction of evidence of extrinsic acts that might adversely reflect on one's character. See Fed. R. Evid. 404(b). "Similar act" or "other bad act" evidence, however, may be admissible if such evidence bears upon a relevant issue in the case. See Fed. R. Evid. 404(b); United States v. Hardy, 228 F.3d 745, 750 (6th Cir. 2000). The rule enumerates a non-exhaustive number of proper purposes for such evidence. See Fed. R. Evid. 404(b). The Sixth Circuit has consistently held that the district court must apply a three-step analysis to evaluate the admissibility of evidence under Rule 404(b). See United States v. Johnson, 27 F.3d 1186, 1190 (6th Cir. 1994). A party seeking to admit 404(b) evidence must first demonstrate that the other bad acts occurred. See id. The party must then cite a specific purpose for which the evidence is offered, after which the trial

_____

[3]Defendant also appears to make a claim that attorney Wilhelm was generally unprepared, but that claim will not be discussed separately because it was not listed as a separate ground in his motion and, in any event, his specific claims encompass that general claim.

court must determine whether the probative value of the identified purpose outweighs the risk of unfair prejudice.  See id.  Thus, a party seeking admission of "other acts" evidence must show the evidence is probative of a material issue other than character.  See Huddleston v. United States, 485 U.S. 681, 686, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988); Hardy, 228 F.3d at 750.

The Sixth Circuit has also previously recognized the propriety of introducing "background" evidence.  See United States v. Buchanan, 213 F.3d 302, 311 (6th Cir. 2000); United States v. Paulino, 935 F.2d 739, 755 (6th Cir. 1991).  Proper background evidence, also known as "*res gestae*" evidence, has a causal, temporal, or spatial connection with the charged offense and includes evidence that is: (1) a prelude to the charged offense, (2) directly probative of the charged offense, (3) arises from the same events as the charged offense, (4) forms an integral part of the witness's testimony, or (5) completes the story of the charged offense. United States v. Martinez, 430 F.3d 317, 335 (6th Cir. 2005) (citing Hardy, 228 F.3d at 748. Background evidence falls outside the parameters of 404(b), so there is no reasonable notice requirement for its admission.  United States v. Joseph, 270 Fed. Appx. 399, 405 (6th Cir. 2008) (quoting Hardy, 228 F.3d at 748).

The Sixth Circuit explained the distinction between acts that are intrinsic to the offense charged, and thus not subject to Rule 404, and extrinsic "other acts," which are subject to the rule:

> [w]hen the other crimes or wrongs occurred at different times and under different circumstances from the offense charged, the deeds are termed "extrinsic."  "Intrinsic" acts, on the other hand, are those that are part of a single criminal episode.  Rule 404(b) is not implicated when the other crimes or wrongs evidence is part of a continuing pattern of illegal activity.  When that circumstance

applies, the government has no duty to disclose the other crimes or wrongs evidence.

United States v. Barnes, 49 F.3d 1144 (6th Cir. 1995).

Here, the court need not determine whether the evidence was properly admitted because defendant's claim of ineffective assistance of counsel is factually incorrect. Attorney Wilhelm filed a "Motion for Notice From the Government Regarding 404(b) Evidence" (D/E #314) and that motion was denied on the basis that the government did not intend to introduce any such information (M Tr p. 9). Moreover, during the government's opening statement, attorney Wilhelm objected to the mentioning of defendant's prior criminal conviction. (Tr IV, p. 21) That objection was overruled and the information was admitted. (Tr IV, pp. 21-22) Given that attorney Wilhelm made the motion and objection sought by defendant, defendant's claim for ineffective assistance of counsel fails with respect to trial counsel's failure to object to evidence regarding his prior conviction.[4]

## B. Ground Two

Defendant also argues that attorney Wilhelm was ineffective because he failed to object to inadmissible hearsay testimony. Specifically, defendant asserts that the testimony of Special Agent German with respect to statements made by Allen Phillips, Wayne Parker, DEA agents involved in the interception of packages, and others constituted inadmissible hearsay. However, this court need not reach the question of whether counsel's failure to object to the alleged

---

[4]Defendant does argue that attorney Wilhelm should have objected to the evidence of his prior conviction in a motion *in limine*, rather than during opening statements, but it is clear from the transcript that the trial court consider the arguments on the merits and that the trial court did not rule against defendant because the argument was untimely. Therefore, defendant was not prejudiced by any delay.

hearsay was objectively unreasonable because defendant has failed to demonstrate the prejudice required to succeed on a claim of ineffective assistance of counsel. Under Strickland, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. Defendant has not made such a showing here.

On direct appeal, the Sixth Circuit discussed the alleged hearsay testimony in the context of defendant's claim that the district court committed plain error by admitting testimonial hearsay evidence in violation of the Confrontation Clause and it found that the alleged hearsay did not affect the outcome of the trial:

> Jones' Confrontation Clause argument is also without merit. Jones correctly admits that the plain error standard applies to his Confrontation Clause objections because he failed to raise them at trial. See United States v. Vasilakos, 508 F.3d 401, 411 (6th Cir. 2007) (citing United States v. Evans, 883 F.2d 496, 499 (6th Cir. 1989)). The plain error standard is met if the appellant can show that there is: (1) an error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. See United States v. Arnold, 486 F.3d 177, 194 (6th Cir. 2007) (quoting United States v. Cotton, 535 U.S. 625, 631, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002)). The third and fourth elements of that standard are absent here.

> The third element cannot be satisfied unless the error "affected the outcome of the district court proceedings." Cotton, 535 U.S. at 632, 122 S.Ct. 1781 (quoting United States v. Olano, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). Jones cannot prevail on this element because he has not demonstrated that he would have been acquitted but for the admission of the objected-to hearsay evidence. To the contrary, Jones almost certainly would have been convicted regardless of whether the jury had heard that

evidence.  The testimony of Julia Carter, who was an active participant in the drug ring, provided a sufficient quantity of evidence against Jones that he probably would have been convicted on that evidence alone.  Carter testified that Riley Troy Graham enlisted her help in purchasing cocaine in California and preparing it for shipment to Michigan.  She further testified that Jones, who was then using the alias Brian Simms, helped facilitate her purchases of cocaine and provided some of the equipment that was used to prepare the cocaine for shipment.  Describing in detail the methods by which the cocaine smuggling operation was carried out, she testified that Riley Troy Graham would contact her whenever he needed a shipment of cocaine.  He would then wire money to several individuals in California, she would go to Jones' house, and he would be expecting her even though she had not informed him that she was coming or otherwise contacted him in any way.  Once Carter arrived at Jones' house with the money, Jones would arrange for the cocaine supplier to come to his house as well.  Jones would then take the money from Carter and negotiate a purchase of at least a kilogram of cocaine.  After the drugs were acquired, Carter would take them to Jones' garage, which housed a one-ton press.  Using the press, Carter would make the drugs into cocaine "hockey pucks" that could be covered with wax and made to look like an ordinary candle so they could be shipped to Michigan.  The candles were shipped from the Business and Postal Center in Beverly Hills, which Jones admits to owning.

On top of Julia Carter's testimony, the testimony of Kyle Stevens also indicates that Jones was a member of the conspiracy.  Stevens, a cousin of Riley Troy Graham, was also a member of the conspiracy.  Stevens used his position as a UPS deliveryman to assist Graham's criminal enterprise.  His job was to ensure that packages of cocaine being sent from California arrived safely at their destinations in Michigan.  Stevens testified that Graham would have drugs sent to addresses on Stevens' regular delivery route and that Graham would alert Stevens when a package was on its way.  It would then be Stevens' job to deliver the package to a location selected by Graham.  Stevens further testified that Bryon Jones once accepted delivery of a package of cocaine at a designated delivery point.  The combination of this evidence with Julia Carter's very condemning testimony strongly indicates that Jones was a member of the drug-dealing and money-laundering conspiracy and would have been convicted regardless of whether

the jury heard the objected-to hearsay evidence. Thus, the
testimony given by Carter and Stevens belies any argument that
Jones was prejudiced by the hearsay evidence.

This conclusion is supported by the fact that the hearsay evidence
has almost no relation to Jones. For the most part, it simply
confirms the existence of the conspiracy, which Jones did not
dispute to begin with. At worst, the evidence might have bolstered
the Government's case in an inconsequential way by virtue of the
fact that it is consistent with the rest of the Government's proof.
Because the objected-to evidence has so little bearing on Jones'
guilt, and because Carter and Stevens provided such inculpatory
testimony against Jones, it is almost certain that the hearsay made
no difference in the outcome of the trial. Therefore, Jones has not
satisfied his burden of proving that the alleged errors affected any
substantial rights. See United States v. Stonefish, 402 F.3d 691,
699 (6th Cir. 2005) (quoting United States v. Lowenstein, 1 F.3d
452, 454 (6th Cir. 1993)).

Even if Jones could satisfy the third element of the plain error
standard, however, his claim would still founder on the fourth
element. Given that there was so much legitimately admitted
evidence of Jones' guilt, the alleged errors surely did not harm the
fairness, integrity, or public reputation of the judicial proceedings,
even if they were in fact plain errors. To the contrary, reversing
Jones' conviction on the basis of evidentiary errors that were not
objected to at trial would probably have the effect of harming the
fairness, integrity, or public reputation of the judicial proceedings.
See Johnson, 520 U.S. at 470, 117 S.Ct. 1544 (citation omitted).

United States v. Graham, 278 Fed. Appx. 538, 544-546, 2008 WL 2092274, *5 (6th Cir. May 16,

2008) (Rogers, J.) (footnote omitted).

While defendant correctly notes that the Sixth Circuit was applying a plain error standard

of review to his claim regarding the alleged hearsay, he has provided no basis for this court to

find differently with respect to the effect the alleged hearsay had the outcome of the trial. As

convincingly found by the Sixth Circuit, even if the alleged hearsay been deemed inadmissible,

-28-

defendant would have still be found guilty on the basis of Carter and Stevens' testimony. Accordingly, defendant has failed to show that, had counsel objected and the alleged hearsay been deemed inadmissible, that there is a reasonable probability that the result of the trial would have been different. Absent such a showing, defendant has failed to demonstrate prejudice under Strickland. Therefore, defendant's claim for ineffective assistance of counsel fails with respect to trial counsel's failure to object to the alleged hearsay testimony.

**C. Ground Three**

Defendant further argues that attorney Wilhelm was ineffective because Wilhelm failed to interview government witnesses or call defense witnesses. The government argues in its response that defendant failed to sufficiently support this argument and that, consequently, defendant cannot meet his burden.

Outside of conclusory statements, defendant presents no evidence regarding a failure to interview government witnesses and he does not identify any exculpatory statements that any of those witnesses would have made. Therefore, defendant cannot clearly demonstrate any prejudice and that portion of defendant's argument should be rejected.

Defendant's argument regarding potential defense witnesses is slightly more detailed and requires some discussion. "[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified to are largely speculative." Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002). In order to present an ineffective assistance of counsel claim based upon a failure to call a witness, a defendant must make an affirmative showing as to what the missing evidence would have been and prove that

the witness' testimony would have produced a different result.  <u>Malcum v. Burt</u>, 276 F.Supp.2d 664, 679 (E.D. Mich. 2003) (Hood, J.) (citing <u>United States ex. rel. Jones v. Chrans</u>, 187 F.Supp.2d 993, 1009 (N.D. Ill. 2002) (Norgle, J.)).

Here, defendant failed to identify any potential witnesses in his motion, though he did name three witnesses in his reply brief: Samuel Richardson, Sherman Springer, and Edward Hereford.  With respect to Richardson, defendant also provided an affidavit[5] from Richardson stating that Richardson and defendant's brother rented the 24387 Rensselar address together and that defendant's brother had a license in defendant's name.  However, as noted by the government, Richardson was named on defendant's witness list and attorney Wilhelm specifically stated that he did not think Richardson's testimony was necessary (Tr IX, p. 136), which suggests that the decision not to call Richardson as a witness was a strategic choice.  Moreover, in light of the other testimony in this case, nothing suggests that Richardson's limited testimony would have produced a different result at trial.

With respect to Springer and Hereford, defendant only speculates that their testimony would contain exculpatory information and he has failed to make an make an affirmative showing as to what the missing evidence would have been with respect to him.  Instead, defendant merely asserted that Springer and Hereford both testified before the Grand Jury with respect to Riley Graham's drug organization without saying that defendant had a role in that organization.  Without some showing of their proposed testimony, this court is unable to determine if trial counsel's failure to investigate or to call these individuals as witnesses was

_____

[5]Attached as Exhibit A to Defendant's Reply Brief; D/E #686.

either a professional lapse or a strategic or tactical choice.  The court is also unable, in the absence of a showing as to what the witnesses' testimony would be, to determine whether defendant was prejudiced by the failure of trial counsel to interview or call these witnesses. Therefore, trial counsel's failure to investigate, interview, or present these potential witnesses does not amount to the ineffective assistance of counsel, because defendant has failed to indicate the availability of these purported witnesses or specify the content of their testimony.  Malcolm, 276 F.Supp.2d at 680; Dell v. Straub, 194 F.Supp.2d 629, 650 (E.D. Mich. 2002) (Friedman, J.) (citations omitted).

### D. Ground Four

Defendant also argues that attorney Korn was ineffective because he allowed the issue of whether defendant had a prior conviction to be decided by a preponderance of evidence standard, rather than the beyond a reasonable doubt standard.  In its response, the government argues that defendant received the effective assistance of counsel as defendant stipulated to his prior felony conviction and attorney Korn obtained the sentencing relief sought, *i.e.* exclusion of defendant's prior felony conviction from the calculation of defendant's criminal history under the guidelines.

As a preliminary matter, this court would note that the government mischaracterizes defendant's argument.  While the prosecutor did agree at sentencing that defendant's prior conviction would be excluded from the calculation of his criminal history (S Tr pp. 103-108), that is not the issue before the court here and defendant makes no argument with respect to that portion of his sentencing.

The issue here relates to the statutory sentence enhancement provision of 21 U.S.C. § 841(b). 21 U.S.C. § 841(b) provides that "[i]f any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment." In his Sentencing Memorandum and Addendum to Objections to Presentence Report, defendant, through attorney Korn, argued that 21 U.S.C. § 841(b) did not apply to this case. As argued by attorney Korn, there was no evidence presented at trial that defendant committed any act in furtherance of the charged conspiracy after April 16, 1996, the date his 1996 California conviction became final, and therefore the 1996 California conviction for conspiracy to purchase cocaine is not a prior conviction within the meaning of 21 U.S.C. § 841(b). At sentencing, the trial court conducted an evidentiary hearing on this issue of whether defendant was involved with the conspiracy after his release from jail in the California case. (S Tr p. 17-98) At the start of that hearing, attorney Korn agreed that a preponderance of the evidence standard should be used. (S Tr p. 17) Defendant now argues that, by a agreeing to a preponderance of evidence standard, attorney Korn denied defendant the effective assistance of counsel.

Defendant's argument should be rejected because the correct standard was used at the evidentiary hearing and any challenge to that standard by attorney Korn would have been futile. An attorney is not required to make meritless objections to avoid a claim of ineffective assistance. Krist v. Foltz, 804 F.2d 944, 947 (6th Cir.1986). Here, while defendant argues that the prosecution should have been required to prove the applicability of § 841(b) beyond a reasonable doubt, the case law makes clear that the trial court correctly used the preponderance

-32-

of evidence standard.  See United States v. Wheaton, 517 F.3d 350, 367 (6th Cir. 2008) (finding

that it is the government's burden to prove the elements of an enhancement by a preponderance

of the evidence); United States v. Feinman, 930 F.2d 495, 500 (6th Cir. 1991) ("In cases where

the applicability of an enhancement provision is contested, the government bears the burden of

establishing the enhancement factors by a preponderance of the evidence."); United States v.

Gibson, 985 F.2d 860, 866 (6th Cir. 1993) (stating that, at sentencing the United States bears the

burden of proving by a preponderance of the evidence any factors used to support a sentencing

enhancement); United States v. Thompson, 274 Fed. Appx. 453, 454-455 (6th Cir. 2008) (stating

that the government bears the burden of proving by a preponderance of the evidence the

existence of prior convictions used to determine the defendant's criminal-history category under

the Guidelines); United States v. Gonzalez, 257 Fed. Appx. 932, 940-941 (6th Cir. 2007)

(holding that it is the district court, rather than the jury, that determines, based upon facts proven

by a preponderance of the evidence or admitted to by a defendant, whether a sentencing

enhancement under § 841(b) applies) (citations omitted).[6]


      Defendant relies solely on the provisions of 21 U.S.C. § 851(c), but that statute is

inapplicable to this issue.  That statute, which relates to the procedures for establishing prior

convictions, provides:

_____

        [6]To the extent defendant wanted attorney Korn to make the legal argument that, as a
matter of law, prior convictions cannot have occurred during the term of the alleged conspiracy,
that argument are been clearly rejected by the Sixth Circuit.  See United States v. Hughes, 924
F.2d 1354, 1355-1362 (6th Cir. 1991).  See also Gonzalez, 257 Fed. Appx. at 943-945 (Applying
Hughes and concluding that § 841(b) enhancement was appropriate even though the two
drug-trafficking convictions occurred during the existence of the alleged conspiracy).

(c) Denial; written response; hearing

(1) If the person denies any allegation of the information of prior conviction, or claims that any conviction alleged is invalid, he shall file a written response to the information. A copy of the response shall be served upon the United States attorney. The court shall hold a hearing to determine any issues raised by the response which would except the person from increased punishment. The failure of the United States attorney to include in the information the complete criminal record of the person or any facts in addition to the convictions to be relied upon shall not constitute grounds for invalidating the notice given in the information required by subsection (a)(1) of this section. The hearing shall be before the court without a jury and either party may introduce evidence. Except as otherwise provided in paragraph (2) of this subsection, the United States attorney shall have the burden of proof beyond a reasonable doubt on any issue of fact. At the request of either party, the court shall enter findings of fact and conclusions of law.

(2) A person claiming that a conviction alleged in the information was obtained in violation of the Constitution of the United States shall set forth his claim, and the factual basis therefor, with particularity in his response to the information. The person shall have the burden of proof by a preponderance of the evidence on any issue of fact raised by the response. Any challenge to a prior conviction, not raised by response to the information before an increased sentence is imposed in reliance thereon, shall be waived unless good cause be shown for failure to make a timely challenge.

Section 851(c) was enacted by Congress in 1971 as part of the Comprehensive Drug Abuse Prevention and Control Act of 1970 ("the Act"), Pub. L. 91-513, Title II, § 411, Oct. 27, 1970, 84 Stat. 1269, but the legislative history of the Act leaves few clues as to the intended meaning of section 851(c). All that is clear is that "[the Act] is designed to deal in a comprehensive fashion with the growing menace of drug abuse in the United States ... through [among other methods] providing more effective means for law enforcement aspects of drug

-34-

abuse prevention and control...."  H.R. Rep. No. 1444, 91st Cong., 2d Sess., reprinted at 1970

U.S. Code Cong. & Admin. News 4566, 4567.  With respect to section 851(c) in particular, the

House Report states that "[section 851(c)] prescribes the procedure for establishing prior

convictions so as to authorize imposition of an increased penalty upon subsequent conviction."

Id., U.S. Code Cong. & Admin. News at 4618.  In Custis v. United States, 511 U.S. 485, 492,

114 S.Ct. 1732, 128 L.Ed.2d 517 (1994), the Supreme Court noted that "Congress intended to

authorize collateral attacks on prior convictions at the time of sentencing" under 21 U.S.C. §

851(c).  See also United States v. Choate, 239 Fed. Appx. 255, 258 (6th Cir. 2007) (holding that,

at sentencing for his federal conviction, the defendant could only collaterally attack his prior

state conviction pursuant to the procedures contained in 21 U.S.C. § 851(c)).

 Here, defendant was not collaterally attacking his prior state conviction and, instead, he

stipulated to its existence.  Defendant is merely challenging whether the relevant sentencing

enhancement applied to his case given evidence regarding the dates of the conspiracy.

Therefore, § 851(c) is inapplicable to the claims defendant makes here.  Moreover, to the extent

the statute does apply, § 851(c)(2) provides that "[t]he [defendant] shall have the burden of proof

by a preponderance of the evidence on any issue of fact raised by the response."

**IV. Conclusion**

 For the reasons stated above, the court recommends that defendant's motion to vacate

sentence be **DENIED**.

 The parties to this action may object to and seek review of this Report and

Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as

provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. Thomas v. Arn, 474 U.S. 140 (1985); Howard v. Secretary of HHS, 932 F.2d 505, 508 (6th Cir. 1991); United States v. Walters, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987).

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

S/Virginia M. Morgan
Virginia M. Morgan
United States Magistrate Judge

Dated: April 22, 2010

---

## PROOF OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and Byron Jones, FCI - Big Springs, 1900 Simler Avenue, Big Spring, TX 79720, via the Court's ECF System and/or U. S. Mail on April 22, 2010.

s/J. Johnson
Case Manager to
Magistrate Judge Virginia M. Morgan